Good morning, and may it please the Court, I am Joshua Weiss from the Federal Public Defender's Office, here on behalf of Appellant Anthony De La Torriente. I'd like to reserve two minutes for rebuttal, and I will keep my eye on the clock. And I intend to focus first on the jury instruction and then the insufficiency of the evidence, both on Count 1, but I'd be glad to address any questions the Court might have about any of the issues. Mr. De La Torriente was charged with two counts that asked the jury two different questions. Count 2 asked the more familiar question of whether there was sexual contact without consent, and that count carried a potential prison sentence of up to two years. But this appeal focuses on Count 1, the sexual abuse charge, which increased Mr. De La Torriente's sentencing exposure to life imprisonment, and which applies, as this Court said in James, only to the infrequent scenario where the victim is incapable of communicating for refusal of unwanted intercourse. Both our insufficiency challenge and our challenge to the jury instruction come down to the question of whether the plain terms of the statute apply, requiring evidence of an inability to communicate a lack of consent, or whether some lower threshold of incapacity satisfies this crucial element of this serious charge. Now, starting with the jury instruction, I think there would be no dispute that the instructions were erroneous if the district court had told the jury that, to be physically incapable, one may not actually be physically incapable. But what the district court did instruct the jury came very close to that problem. The only instruction the court gave defining the physically incapable element was to tell the jury that, quote, a person need not be physically helpless to be physically incapable of declining participation in or communicating unwillingness to engage in a sexual act. I've tried hard to think of a hypothetical situation where a person could be physically incapable of communicating a lack of consent either verbally or with physical gestures, but would not be considered physically helpless under any colloquial definition of that term. And I honestly cannot come up with an example. Did you give a proposed jury instruction? Well, Your Honor, what we proposed was simply not to add on this additional instruction and just to give an instruction that gave the statutory language, as the court did in initially laying out the elements. Because under our argument, and as we read James, you know, the language of the statute speaks for itself. And we did not need this additional add-on instruction that effectively lowered the threshold of incapacity required. That additional language comes from James, doesn't it? No, Your Honor. I would say that it takes a portion of the holding of James out of context, where the context in James, James was very clear that this term physically helpless was being used by the district court in that case in a manner that was specifically not given its ordinary or common sense meaning. And James emphasized that, you know, the district court there applied certain state laws that apply this extra strict definition of physically helpless that does not track colloquial language. And James explained that under other state laws that define the term physically helpless in an ordinary or common sense manner, the term really does track the sexual abuse statute. So, for example, James pointed out that under Iowa law, the term physically helpless, quote, means a person who is unable to communicate unwillingness to act, which is literally the physically incapable standard at issue here. That's at James pages 680 to 81. So, you know, James was talking about this very technical statutory definition that was specifically not given its common sense definition. But, of course, the jury here had no idea that the jury instruction was using this legal term of art and instead was left to decide, well, it was being told, well, you know, the standard that says physically incapable, it doesn't really mean it doesn't mean physically helpless. And they were left to parse what those two whether there's any distinction between those two terms in an ordinary sense. Now, the government's brief. You said that the judge also charged the language of the statute at the part of as part of the instruction. So this was later on as he went through it. The reason I asked you whether you asked for a an instruction is that, you know, you'll find cases that say it's often not wise to just cut and paste language from an appellate court decision, construing the statute and put it in a charge to the jury. So, you know, I was thinking that something like it's for you to decide, ladies and gentlemen, and I'm just I'm not saying that this is the exact language, whether because of the extent to which she had bribed or drunk alcohol beverages throughout the day. She was physically able either to resist, i.e., in the sense of pushing him away or, or whether she was capable in some other way of communicating that she didn't want him to do it. Now, I think that had you had you made such a request. Might have been might have been a better way for the for a jury to to to avoid what you say is the confusion. But, you know, the judge of the trial judge and I don't want to take any more of your time. He he he he he actually used the language the judge Tom and used him in James. And that's in the model jury instructions, which, of course, are not do not have the sanction, the explicit sanction of this court. And that's what troubles me about your argument. It's not so much that you object to this charge is that you didn't give an alternative. That might have been clearer to a lay jury and have conveyed what you think should have been conveyed. And I'll stop. I don't want to take any more. No, I appreciate it, Your Honor. A couple of thoughts there. First of all, I agree that, you know, there we there could have been a different follow up instruction that would have clarified this instruction. But as to your honor's question about whether a follow up instruction was necessary. I do not believe it is because James talked about as the government emphasizes that, you know, this physically incapable of communicating unwillingness or declining participation in is a standard that should be left to the jury, allowed for the jury to assess what that you know, whether the facts meet this very particular standard. And as your honor pointed out, the evidence here is essentially that he was extremely intoxicated, which was the finding the district court made in in denying the motion for an acquittal. And it was up to the jury to decide whether that evidence, whether there was an inference to be made, which we think was not substantiated by the evidence. challenge, whether there was whether there was sufficient evidence to meet this particular standard. And this model instruction, you know, the Ninth Circuit has been clear that a model instruction is still reviewed de novo. In the case of Warren that we that we referred to, the instruction was even applied. The court looked at plain error review on a model instruction. And so, you know, the standard itself was given in colloquial terms. And then the court followed up with it with a standard that essentially told the jury, you know, this, this element does not actually require as strict of an application as you might have thought, just here in the element of the charge. And the follow up instruction came immediately after the court laid out the elements and thereby lowered the threshold of incapacity, I believe, unfairly. Mr. Worth, let me ask you just to follow the question along here. Even if you assume that there may have been some error in the instruction, why wasn't it harmless? Certainly. Am I of all the evidence, and is that, I guess that also relates to your substantial evidence argument, insufficiency argument. Yes, thank you, Your Honor. Well, first of all, you know, the defense argued at length in its closing that while Mr. De La Torrente's conduct might not have been a model of what the jury thought good consent should look like. And while the actions might have been distasteful to the jury, the question here was whether AB could communicate a lack of consent either verbally or with physical gestures. And there was extensive evidence that AB was communicative throughout the day. And most importantly, just before the friends left, the two of them alone in the room together, and after the friends came back. And there was no testimony from AB who testified unequivocally that she woke up before the sexual act occurred. And she described every moment of the interaction. She did not say she was physically unable to communicate a lack of consent. And then the government, in its rebuttal closing, went immediately to the challenged instruction. It said... Go ahead. I'm sorry, Your Honor. And it basically... So this instruction was a powerful piece of supposed law the government fell back on to argue that essentially evidence that AB was extremely intoxicated sufficed to prove guilt, regardless of whether she could actually technically communicate, and despite the evidence that she actually could. Just before the act, how much time had passed by the time when they got her back to the room and this incident occurred? The record is not clear on that, Your Honor. Between when they got back to the room, we know that AB talked for at least 20 to 30 minutes. That was uncontested testimony going to that point. Then the friends left the room. And then at some point after that, AB woke up before any sexual act had occurred, and she described every moment... Why wasn't it under those circumstances? Why wasn't it reasonable for the jury to conclude at the time that this all happened? She was pretty much intoxicated and unable to give the consent. Well, Your Honor... I'm sorry, I didn't mean to interrupt. I don't know. The evidence... I don't know. Go ahead. I'm just curious. So the government asked AB questions going to this precise point, asking about her capacity between the time she woke up and when the sexual act occurred. AB said she noticed the lighting in the room. She confirmed that she felt intoxicated. And then when the government asked a directed question going to her capacity, AB said she felt scared and confused, upset. But the question here is not just whether AB was intoxicated. It was whether she was physically incapable of saying no or otherwise communicating a lack of consent verbally or physically. The government tried multiple times to elicit testimony going to that point, and there was simply no testimony on that point, which distinguishes this case from any other where a conviction like this has been affirmed. The government points to Demery, for example, from the Eighth Circuit. But there the victim specifically testified that the sexual act happened very quickly. The second she opened her eyes, the act of penetration occurred. She said it was very quick and I didn't have time to react. We don't have any testimony like that here. Well, she said she, first of all, they got on the boat. It's quite clear. I think it's 515. And this occurred somewhere between 645 and 7, which is not a long period of time. And she was, we might say, in an intoxicated, in due sleep. And I believe she testified that she woke up and found someone pulling down on her underwear. And she was intoxicated, scared, and confused. And she felt someone grab her breast and try to penetrate her vagina with a finger. This is all, it's not as if she were wide awake when this began. I mean, that's the part that I think I would suggest may make this a jury question. Well, Your Honor, we believe that the inference that both Your Honor and Judge Pais were referring to, to draw the conclusion from, you know, she testified that she woke up, she felt intoxicated, to infer from that. She said she woke up, if I, if my, I'm quoting now. She said she woke up around 645 to 7 p.m. Now, they got on the boat, I think, at 515. I think it was to find someone pulling down on her underwear. And she was intoxicated, scared, and confused. And he was immediately essentially sexually assaulting her. Again, Your Honor, I'm sorry. The inference there, the question is whether an inference from that testimony to that she could not physically say no, whether that's a reasonable inference to conclude beyond reasonable doubt. We believe that it is not. But even if the court concludes that it is a reasonable inference. Can I interrupt you again? I'm sorry. Apologies. The words physically incapable, I agree with you. They, they, they, the charge could have been better. Because physically incapable, what does that mean? The question really is, was she capable or incapable because of the degree of intoxication to, to either physically push him away or, or avoid this? And, of course, pushing him away would indicate a lack of consent. Or verbally saying, no, stop, don't do it. Whatever the, whatever the words were. And that's where it seems to me it, it's a, it's a question for the jury. And he didn't make it any easier on himself by the defense that he worked, by the statements that he made afterwards. I've gone way over time. If I could just point out. To answer this, respond to Judge Corman's comment or question, and then we'll hear from the government. Thank you. I would just point out that if, if the court thinks that that, the question of whether that inference was reasonable should have been left to the jury, that just emphasizes why having the correct jury instruction was so important here. There wasn't direct evidence going to the specific point of this element, whether she was physically incapable of communicating. The question is whether her level of intoxication, and the fact that she had woken up recently, whether it was a fair inference from there that she cannot physically communicate. And having an adequate jury charge on that particular point was crucially important. That was the key issue, key question at issue in the case. The government emphasized the jury instruction in order to effectively argue that intoxication sufficed, and undercut the defense's arguments on this point. So we believe that that would be a speculative inference, insufficient to sustain the charge, but at least that underscores the problem with the instruction. Thank you, Your Honor. Okay. Thank you. We'll hear from the government. Thank you. Good morning, Your Honors. Aaron Roper for the United States. Based on the evidence presented at trial, a rational jury could conclude, as this jury did conclude, the defendant committed sexual abuse against a woman so drunk she couldn't speak coherently or perform basic functions when he ripped off her underwear in her sleep and sexually assaulted her. This is not a closed case on the evidence. Taking the facts in the light most favorable to the government, rational juror could conclude that moments before the assault, A.B. could not perform basic functions. She couldn't walk, shower, dress herself, or even go to the bathroom without someone helping her. But that was most of what occurred before she went to sleep. That's correct. And so the question then becomes, you know, this is a case where there was no expert witness about the extent to which your metabolism reduces the blood alcohol. And so you're just leaving out the fact that she had slept for whatever, talking about a half hour, 45 minutes. It's not entirely clear how long her colleagues were away. I think there was some indication that they purchased something at around 6.35 and then they came back. It would have been between 6.35 and 7 that this occurred. So it's not quite you're right that all of this occurred and she wasn't speaking coherently. But then she went to bed and she slept. And it seems to me that the question then becomes, at the time that she was awakened, what her condition was. And it still could have been alcoholic-induced. But the question then becomes whether the jury was instructed. I'm rephrasing the argument. I'm not necessarily agreeing with it. Your colleague is arguing that, you know, the charge wasn't clear enough to the jury that it should have essentially communicated that whether she was sufficiently intoxicated or was her degree of intoxication was such that she couldn't physically resist or communicate verbally her unwillingness to have him do this. Just to say, stop, that's the real issue here. That's right. And I think the most powerful evidence on that score is that moments after the assault, her friends come into the room and she is a deer in the headlights. They ask her what's wrong and she wasn't answering us. That's what Baral testified at page 156. I think that's very powerful evidence she couldn't speak at all. Another witness says that she was so quiet, he couldn't figure out what she was saying. So I think there is very powerful evidence of a total inability to speak. On the jury instruction issue, since my friends said most of it. I don't know what point. She does indicate that her vagina hurt. I mean, I don't know what point you're talking about the conversation with her friends. Obviously, before she went to sleep and before they left her in the room, she was talking and she was talking in what could be described as not in a coherent way, not in any logical progression of thought. And then she goes to sleep. But when they come back to the room, she communicates that her vagina hurt and that I believe she may have said the defendant was the one who was responsible. So she was capable of communicating when her friends got back to the room, which might have been right afterward. In fact, he had locked the door and then he quickly, virtually in the midst of this assault, he stops and unlocks the door when he gets her dressed. So I think there's two ways to look at the facts there, both of which support conviction. The first is that the testimony is that when they immediately come into the room, she cannot speak at all. I think a jury could conclude that that's what's temporally closest, and the fact that she later regains this ability to speak doesn't say anything. I think you could also say even if she was able to eventually get out to them that her vagina hurt, if you read that testimony, it takes her a very long time to get that point across. If you compare that with how quickly the assault occurs, I mean, she's asleep. He rips off her underwear and then, as Your Honor said, attempts to penetrate her digitally, and then he completes the sexual act by making mouth-to-vulva contact. This is happening extremely quickly. If you look at how fast the assault occurred post-sleep with how long it took her to tell her friends what had happened, I think a jury could rationally base its conclusion on that. Mr. Roper, I think early on in opposing counsel's argument, he said he can't think of any distance between physically helpless and physically incapable. This goes to the jury instruction. Can you think of any distance? When would somebody be physically incapable but not physically helpless? Yes. As this court helpfully explained in James, physically helpless implies an inability to do anything at all. So if the standard was physically helpless, I think the defendant would have been pointing to facts like her ability to walk with assistance, the fact that someone else was able to brush her teeth, that she could go to the bathroom while someone else was helping her. But the federal standard, the physically incapable standard, which James probably rejects, the helpless standard, looks at a victim's specific inability to do two things, her inability to decline participation or communicate unwillingness. So I think the role of the jury instruction is that it helpfully, as James said, spells out the difference between an absolutely helpless... That's helpful, I guess, to understand. Would the jury know that, or is the jury just kind of left with physically helpless versus physically... You see what I'm saying? Because I think your explanation of the difference makes some sense in the James case. But is that something that the jury would know, or did the jury just get these two phrases? So I think that is an ordinary dictionary definition, meaning of those two terms. Helplessness implies an inability to do anything at all, and incapability looks to the thing the victim is unable to do. But once you accept that the jury instruction is a correct articulation of the law, I think it's very hard for the defendant to show that the district court abused its discretion in giving the model instruction, or certainly that that had an outcome on the ultimate result of this trial. So I think if you read James as a whole, it's clearly distinguishing between physical helplessness as a whole and the federal physical incapable standard. Yes, it's naturally focused on the narrow version used by the state court there, but more broadly, it rejects an analogy of state law and emphasizes that the federal statute doesn't use the term physically helpless, and it explicitly states that physically helpless implies an inability to do anything at all, and a jury could properly convict, in its good judgment, a defendant under this statute even where the victim wasn't totally helpless. It's not your position that you needed this additional language in the instruction in order to obtain a conviction, is it? No, absolutely not. Did the government propose this additional language? We did, yes. I think that just underscores the reason why any slight possibility of confusion here would be harmless. I mean, the issue at trial wasn't, is A B absolutely, totally helpless? It was, is she unable to decline participation or communicate unwillingness, just like the statute says? And then on the sufficiency challenge, I think the defendant has a very high hurdle there with the standard of review. As I've already explained with Judge Foreman, I mean, the jury heard evidence that she wasn't able to speak at all in the moments afterwards. I mean, the jury also is hearing all this evidence of her extreme physical impairments, her inability to walk, shower, dress herself, and that's also a very strong indication of her inability to decline participation. Looking a little earlier temporally, the jury also sees the video of her slumped over with her eyes rolling back in her head. That's what's screenshotted at page 1045 of the record. That's obviously a little temporally earlier, but I think that's very powerful direct evidence that the jury saw with its own eyes, and the court can see for itself that this isn't just a woman who's intoxicated. This is really someone who's at an extraordinary level of inebriation. And finally, I just emphasize again the role that sleep plays here. I mean, just like the victim in Barrett and the victim in Demery, Aby is woken up by the assault in progress, and the first thing she remembers is the defendant ripping off her underwear, and then he immediately goes on to complete the sexual act. I think a rational jury could look at the strong evidence of her inability to communicate, or at least her severely impaired ability to communicate, compare that with how quickly the assault occurred. If you recall what I said, that because of the degree of intoxication, whatever they find it to be, she was simply unable to either physically resist, i.e., push him away, for example, or to communicate in some... verbally. That she, in effect, didn't want this done. Stop. One word would have been almost sufficient. Wouldn't that have been a better way to explain this to a lay jury than to get involved in these subtle distinctions that we're arguing about this morning? I agree that's an accurate statement of the law with the addition that the jury could also look to sleep, not just intoxication. Yes, okay, but what I'm getting at is that there's a way to explain this to a layman in a way that they could much more clearly understand what to do than simply cutting and pasting from, you know, Judge Tolman's as characteristically excellent opinion that the language was taken from. And there are times when it's not great to cut and paste like that. And hopefully you don't have a lot of cases like this. But if you do, think about it the next time you propose an instruction like this. Yeah, I absolutely don't disagree that there are other ways the Court could have helpfully articulated the standard. I would just say that I don't think the District Court here abused its discretion in properly restating the law from Judge Tolman's opinion. They also didn't ask for it. So if the Court has no further questions, I see them over time. We respectfully urge you to affirm. Thank you. Thank you, counsel. We'll have a minute of rebuttal. Mr. Weiss? Thank you, Your Honor. If I could just go to this point of the distinction between physically helpless and physically incapable again. I think the distinction the government gives makes some sense with other examples, like the government talked in its brief about how someone could be physically incapable of dunking a basketball without being physically helpless. Sure, but the question here is what is the difference between someone who is physically incapable of communicating a lack of consent by verbally saying no or, as in the Fourth Circuit case, Williams, where the act of pulling up one's underwear meant that there was insufficient evidence to convict here. What is the difference between that person and a person who is physically helpless? I don't believe there's any line there, or if there is, it is just too thin. The government talked about Demery, but there there was specific testimony from the victim that the sexual act of penetration happened too quickly. She immediately opened her eyes, and then the sexual act occurred, and she didn't have time to react. We don't have any testimony like that here. So any inference the jury was going to draw that A.B. lacked that capacity was just speculative, and at least they needed that exact charge to guide whatever inference they were going to draw. Thank you very much. We seek a reversal on count one and a new trial on all remaining counts. Thank you very much. Okay, thank you. Thank you, counsel, on the matter submitted at this time.
judges: Paez, Korman, Vandyke